Filed 10/21/21  In re A.E. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re A.E. et al., Persons Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>C.D. et al.,<br><br>        Defendants and Appellants. | A160928<br><br>(Sonoma County Super. Ct. Nos. 5970DEP, 5971DEP) |

C.D. (Mother), mother of six-year-old A.E. and two-year-old C.M., and Tyler E., father of A.E. only, appeal after the juvenile court denied Mother's petition for modification as to both children, filed under Welfare and Institutions Code section 388[1]; terminated their parental rights; and selected adoption as the children's permanent plan, pursuant to section 366.26.

On appeal, Mother contends the juvenile court abused its discretion when it denied her section 388 petition and refused to order reunification services, as to A.E. only.  In addition, both Mother and Tyler contend the order terminating their parental rights must be conditionally reversed

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

because the juvenile court failed to ensure compliance with the Indian Child Welfare Act (ICWA, 25 U.S.C. § 1901 et seq.); the Sonoma County Human Services Department (Department) concedes this issue. We reject Mother's argument regarding the denial of her section 388 petition, but will conditionally reverse the orders terminating parental rights and remand the matter for the limited purpose of curing the ICWA violations.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Mother, the two children, and C.M.'s father, Albert M., came to the attention of the Department in June 2019, after then two-week-old C.M. was admitted to the hospital due to oral cavity bleeding four days after receiving a frenectomy. C.M., who was not gaining weight, remained in the hospital after being diagnosed with failure to thrive. When Mother stated that she used marijuana heavily, multiple times a day, and had been unable to wake up at night to feed C.M., the family began participating in voluntary family maintenance services on June 14. Subsequently, Mother's adult brother, who lived in the home with Mother's family, overheard Mother talking on the phone and telling a friend that "there were bruises on the baby." He also heard Mother tell the maternal grandmother (MGM), who also lived in the home, that she had watched Albert choking C.M. with his hands.[3] The brother called a child abuse hotline the next time he was at work, on August 1, "just to make sure the baby was ok." Later that day, Mother told a social worker that she had heard C.M. cry more intensely after Albert went to check on her, and she saw him "squeezing/pinching the baby in the neck area with one finger on either side of the neck." When Mother had asked why he did it,

---

[2] Evidence related to Tyler will be limited primarily to those facts relevant to the ICWA issue; the ICWA-related evidence will be set forth in part II., *post*, of this opinion.

[3] Albert M. is not a party to this appeal.

2

Albert replied that when C.M. "cries he 'gets upset and loses it.' " Mother stated that Albert had "done the same thing to the baby's thighs." Mother had responded to Albert's conduct by packing up his things and moving him to his mother's house. Mother had also reported that A.E.'s father, Tyler, was homeless and struggling with substance abuse.

On August 5, 2019, the Department determined that then two-month-old C.M. required a medical workup. A full skeletal survey revealed at least seven rib fractures and a possible humerus fracture; all of the injuries were in various stages of healing. C.M. was transferred to a children's hospital for further evaluation and care. Also, on August 5, Mother disclosed that Albert routinely engaged in sexual intercourse with her while she slept and that he had been verbally aggressive toward her in front of the children. She said that Albert had " 'mental health issues and mood swings,' " which caused him to become angry easily. Mother did not think she could report these incidents because she was in a relationship with Albert. A social worker observed Mother with the children. She appeared attentive and bonded to both of them, and they appeared to be happy and comfortable in her presence. A.E.'s paternal grandmother (PGM) agreed to care for A.E. in her home, while C.M. remained in protective custody in the hospital.

On August 7, 2019, the Department filed original petitions under section 300 for both A.E. and C.M. The petition in C.M.'s case alleged that C.M. had suffered serious physical harm due to Albert's actions (§ 300, subd. (a)); that Mother's substance abuse problem at times rendered her unable to provide adequate care and supervision (§ 300, subd. (b)); and that Mother knew or reasonably should have known that Albert was harming C.M. (§ 300, subd. (e)). The petition in A.E.'s case alleged that A.E. was at risk due to the failure of her father, Tyler, to protect or care for her as a

3

result of his chronic substance abuse problem (§ 300, subd. (b)(1)), and that A.E. was also at risk due to Albert's abuse of C.M. and Mother's substance abuse problems (§ 300, subd. (j)).

On August 8, 2019, the court ordered both children detained. C.M. remained hospitalized and A.E. remained in the PGM's home.

On September 10, 2019, the Department filed a jurisdiction and disposition report, in which the social worker reported that C.M. had been placed in an emergency foster home and A.E. remained in the home of the paternal grandparents. First amended petitions had been filed for both children on September 9, 2019. For A.E., there were new allegations under subdivisions (a), (d), (g), and (i) of section 300, related to Albert's physical and sexual abuse of her and Mother's failure to protect her from Albert. For C.M., there were new allegations under subdivisions (d), (i), and (j) of section 300, related to the sexual abuse of A.E. and Mother's failure to protect both children from Albert's abuse. The amended petitions were based on new information the Department had received during a series of interviews. During interviews in August and September 2019, Mother had described hearing C.M. screaming and crying on August 1, and then seeing Albert with one hand on the back of C.M.'s neck and one hand on her thigh. He had a "demonic look" as he squeezed C.M. so hard that she had bruises on her thighs the next day, which Mother photographed. A few days earlier, she had seen a bite mark on C.M.'s cheek and later saw another bite mark on her arm. She asked Albert if he had bitten C.M., and he said yes. Mother " 'told him you either stop doing this or get out.' " She had never noticed any abuse before that, although she had noticed that whenever she left C.M. alone with Albert, she would come back and C.M. would be crying. She thought C.M. was just being "fussy." Regarding the incident following C.M.'s frenectomy,

4

Mother stated that Albert had taken C.M. out of the room and when he returned, he said, " 'look,' " and Mother saw that C.M. was covered in blood. They took her to the hospital immediately. Mother had also seen bruises on both of C.M.'s feet, but "thought it was from the doctor 'prodding her.' "

When asked about A.E., Mother said that one time, A.E. "had said Albert touched my 'pee pee' and I looked at Albert, 'Did you really do that?' So I said to [A.E.] why did you say that, and she said I had a dream. So I thought maybe her imagination was getting crazy."

Mother denied telling medical staff that she did not wake up in the night to feed C.M. because of her marijuana smoking. After C.M. was born, she smoked marijuana only a little bit and drank alcohol only occasionally, although she used to drink to get drunk before she had children. She acknowledged drinking a half bottle of wine the day before the interview with the social worker, and a half bottle the night before that. She had stopped using methamphetamine six or seven years earlier. Mother also told the social worker that she had been sexually abused by her stepfather, starting when she was five years old. He threatened to kill her if she told anyone.

In an August 18, 2019 interview with a detective from the Sonoma County Sherriff's Department's domestic violence/sexual assault unit, when asked why she was not initially forthcoming with information, Mother responded, " 'I was scared of getting in trouble and going to jail because people would assume I wasn't doing anything.' " She was glad her brother called child protective services.

The detective also interviewed the MGM, who said Albert was jealous of C.M. and did not want her. C.M. would scream and cry every time he touched her, and the MGM witnessed Albert hitting, shaking, squeezing, and biting C.M., as well as "messing with" her while she slept. When asked why

she and Mother did not take any action even though they were concerned for months about how Albert treated C.M., the MGM said, " 'We didn't think he was actually hurting her until he left marks.' " She had thought that C.M. cried when Albert held her because she just hated him. The MGM did not know what Mother saw Albert do since he would do things to C.M. while she and Mother were in the other room. The MGM told the detective that she was an incest survivor who had a child at age 12. She was mentally and physically abused by her father.

Four-year-old A.E. participated in three forensic interviews in August 2019. She repeatedly said, referring to Albert, "I don't want my daddy to hurt my sister." She described seeing Albert choking C.M. She also said Albert "hurts me a lot and I didn't like it." She pointed on a diagram to the places he hurt her, which included much of her body as well as her vaginal area.

New medical evidence showed that C.M. had suffered 11 fractured ribs, a fractured humerus, and a fractured tibia, all in various stages of healing, which suggested "ongoing maltreatment."

On August 30, 2019, the social worker interviewed Albert in jail. When asked about how C.M. got all the fractures, he said, " 'I guess I held her too tight.' " He also admitted biting her twice, on the arm and cheek. He said he started hurting C.M. during her first month of life when she would not be quiet. He would use both hands to squeeze her torso; he did this " 'a lot.' " Regarding the incident that resulted in a hospital visit, when C.M. started bleeding from the mouth, he had been feeding her when he saw blood. When asked how he was putting the bottle in her mouth, he said, " 'Pretty aggressive.' " About half the time he fed C.M., he shoved the bottle aggressively into her mouth. Regarding the bruises on C.M.'s feet, he said

6

they were from him " 'biting her feet or rubbing on them.' " When told that A.E. had reported seeing him with his hand around C.M.'s neck, he said he did not remember that, but added that if A.E. said he had done it, he had. He confirmed that Mother "knew what he was doing," but still let him stay in the home. He did not know why she never called the police. When asked about what A.E. had seen of the abuse, Albert said, " 'She saw it all,' " and when asked who else saw it, he said, " 'Everybody in that house.' " When the social worker told him that C.M. had suffered 13 fractures, Albert began to cry, saying he was sad for " '[t]he devastation I caused for my daughter.' "

When the social worker said that A.E. had reported that he was hurting her too, Albert acknowledged that he " 'molested her.' " He said he " 'played with her clitoris' " about six times and rubbed lotion on her vaginal area, but denied doing anything else. He then acknowledged that he also put his hand on A.E.'s neck a couple of times while he was molesting her. He said Mother did not know what he was doing to A.E.

The social worker interviewed A.E.'s paternal grandparents. The PGM said that they had cared for A.E. regularly during her life. One recent incident that had concerned them was when Mother called them before A.E. came for a visit and said A.E. had an injury to her private parts. The PGM later checked A.E. and saw some redness.

The social worker interviewed Mother's brother, who had been living with Mother's family and had called child protective services. He said that whenever Albert held C.M., she would start crying like he was hurting her. When C.M. was in her crib, Albert would blow on her face and tickle her to get her to cry. Mother's brother also described the bruises and bite marks he and Mother saw on C.M. He said the whole family was worried about C.M.

7

and he believed Mother, who is smart and has a good heart, " 'knew something was going on.' "

Mother's brother is developmentally disabled, and the social worker also interviewed his case manager, who reported that Mother's brother was angry with Mother and the MGM for "not doing a anything to protect the baby." She also said that the family was upset with him for calling child protective services to report his concerns about C.M. The case manager stated that she often came to the family's house in the afternoons, and Mother would be sleeping and A.E., who was always filthy, would be up alone watching YouTube. The case manager also reported that Mother's brother had been sexually abused as a child by a caregiver and the MGM did nothing to help him after he complained. The abuser gave the MGM gifts and money " 'in exchange for having access to' " Mother's brother.

Tyler could not be reached for a statement because his whereabouts remained unknown.

The Department recommended that Mother, Albert, and Tyler be bypassed for reunification services because it was "not in the children's best interest to reunify with their parents." As to Mother, the social worker stated that it was clear, "based on the witness statements that early on Mother witnessed incidents of abuse and failed to take action to protect her newborn from further harm. There were bruises, human size bite marks, unusual bleeding, a distraught baby, and an extremely concerned four-year-old child." Indeed, a full month before her brother called child protective services, Mother had sent a text message to a friend about Albert, stating, " 'I'm mad at him for hurting her. Is that okay??' " Mother had shown "that she does not have the capacity to recognize when her children are in danger, and to act accordingly." Although A.E. had an attachment to Mother, the social worker

8

believed it was outweighed by the likelihood of A.E. being victimized again if she were returned to Mother's care, as well as by the consistent, loving care she was receiving with her paternal grandparents in the safety of their home.

In an October 7, 2019 addendum report, the social worker reported that the Department had received information from Mother's friend, who was feeling guilty for not taking action to protect C.M. after Mother told her that Albert was harming the baby, and after the friend herself saw bruising on C.M.'s cheek on June 30, 2019. Mother initially said that A.E. had bitten the baby, but a couple of weeks later, she said that Albert bit her because he was angry.

At the time of the addendum report, Mother had been participating in individual therapy with Dr. Carolyn Crimmins for several weeks. Dr. Crimmins told the social worker on September 28, 2019, that Mother described Albert's abuse "as something that was out-of-the-blue, occurring one time only" and Dr. Crimmins believed Mother "feels she did all she could and is still minimizing." She had preliminarily diagnosed Mother with complex posttraumatic stress disorder.

Tyler had contacted the social worker by text on September 8, 2019. The social worker called him and texted him several times, asking him to let the Department know if he was requesting custody and to advise him of the upcoming hearing, but he did not respond.

Second amended petitions were filed on October 9, 2019, with added allegations of serious emotional damage to both children (§ 300, subd. (c)), based on Albert's physical abuse of C.M., and A.E. witnessing that abuse.

In a second addendum report filed on December 5, 2019, the social worker reported that C.M. was about to be placed in the home of a non-related extended family member. The social worker had observed C.M. in her

9

new placement; she was relaxed and at ease, constantly smiling and giggling. This was in contrast to the social worker's observations before C.M. moved to that home, when C.M. would "watch[] everyone walking into a room without smiling or showing any affect. When she is in this frozen state, she is not able to eat, respond to social stimuli, or interact with others." A.E. remained with the paternal grandparents, and was doing well in school and in therapy. Mother had told the social worker she was drinking less and only using marijuana at night to sleep. She acknowledged that red flags were there with Albert, but stated that she would never let something like that happen again. The social worker had learned from the PGM that Tyler had been arrested in November, and the social worker had interviewed him in jail on November 26.

At a December 31, 2019 jurisdiction and disposition hearing for Tyler and Albert, the juvenile court sustained the allegations in the second amended petitions in C.M.'s case as to Albert and in A.E.'s case as to Tyler, and ordered a bypass of reunification services for both fathers.

The Department filed a third addendum report on February 11, 2020, in which the social worker reported that Mother continued to test positive for alcohol and marijuana and had admitted she had a substance abuse problem. She had started attending 12-step meetings, obtained a sponsor, and made an appointment for a substance abuse assessment. Dr. Crimmins had also reported on the results of Mother's psychological evaluation. In addition to substance abuse concerns, Mother's complex posttraumatic stress disorder would probably take years to heal because it affected her whole personality. When asked how much therapy Mother would need before Mother could safely parent and make different choices, Dr. Crimmins said, it would be "[a]t least a couple of years." Mother's evaluation also revealed Mother's defense

10

style of denial: " 'She downplays and denies things and pushes it down and then it explodes.' "

On March 10, 2020, following a February 20 contested jurisdiction and disposition hearing, the juvenile court entered orders sustaining the allegations in the second amended petitions as to both children, bypassing Mother for reunification services pursuant to section 361.5, subdivision (b)(5) and (b)(6), and setting the matter for a section 366.26 hearing.

On June 4, 2020, the Department filed section 366.26 reports as to both children. In the report for A.E., the social worker stated that A.E. had been in a placement with the paternal grandparents since August 6, 2019, and the paternal grandparents had asked to be identified as A.E.'s potential adoptive parents. The Department had determined that A.E. was likely to be adopted and recommended that the court order termination of parental rights and a permanent plan of adoption. The social worker described A.E. as "a bright, funny, affection[ate], kind, and helpful five-year-old girl." She was within norms for her mental health status and had made excellent progress with therapy. The Department had observed her with her paternal grandparents, who had been in her life since birth. She appeared to be "very close and trusting of the grandparents," had a healthy attachment to them, and appeared comfortable and secure in their home, which had already "been her safe haven" before she was placed with them. A.E. and C.M. continued to have frequent contact while residing in separate potential adoptive homes, which both sets of potential adoptive parents said would continue.

Mother had continued to visit with A.E. twice a week, with the paternal grandparents supervising visits. Mother had "made progress in emotional regulation, having a positive attitude and appearance, and her ability to engage with [A.E.]." However, she still struggled with " 'controlling behavior,

11

showing her frustration, negative comments and disassociation . . . ." A.E. "looks forward to visits, enjoys visits, but does not ask for more."

In the section 366.26 report for C.M., the social worker reported that C.M. remained in the home of the non-related extended family member, where she had been placed on October 20, 2019. The caregivers had requested that they be identified as C.M.'s potential adoptive parents. The Department had determined that C.M. was likely to be adopted, and recommended that parental rights be terminated and a plan of adoption ordered. C.M. was currently in good health and although she had some developmental delays, she was receiving services and making good progress towards meeting milestones. She was easily soothed and responded "to all members of her potential adoptive family with smiles and babbling." She was now "a confident one-year-old who enjoys exploring her environment, playing with toys, all the while staying engaged with her caregivers." Her behavior indicated she was well cared for and had developed trust and healthy attachments to her caregivers, who were committed to raising C.M. as their daughter. The potential adoptive parents had been friends with A.E.'s paternal grandparents for years, and C.M. and A.E. had frequent contact.

Mother had visited with C.M. every other week via Zoom, although it was hard to get C.M. to engage, which was understandable given her young age and the fact that she had not been in Mother's care for the past 10 months.

On June 11, 2020, three months after the court had denied her reunification services, Mother filed a petition for modification pursuant to section 388 as to both children, requesting that the court order "reunification services and/or authorization for a trial home visit and/or return of the children with family maintenance services." Mother stated that her

12

circumstances had changed because she had participated in a residential treatment program, had completed a parenting class, was speaking to her sponsor daily and attending 12-step meetings, was working with a parent mentor and attending group sessions, was meeting with her psychologist twice a week, had built a support network, had learned self-care, and had continued to visit with her daughters.  Mother believed the requested order was in the children's best interests because Mother had benefitted and continued to benefit from services and believed "it would be detrimental to the children not to reunify with her due to their close, positive attachment with her."

Several letters were attached to the section 388 petition, including one from Mother regarding her progress in recovery and how she was learning to protect her children and be a strong parent for them.  Also attached to the petition was a treatment summary from Dr. Crimmins, Mother's psychologist, stating that Mother "has made a greater than expected amount of progress during a relatively short period and continues to maintain her sobriety and work on her emotional issues."  Additional attachments to the petition included letters from Mother's residential treatment program, her parent mentor, and a therapist who had recently begun trauma-informed counseling with Mother.  Edward Olvera, the therapist, stated that Mother had committed to recovery and was "taking personal responsibility to change her life, which ha[d] been profoundly impacted by trauma and addiction." Olvera believed that she "appears to have a very promising prognosis" and that there was "a reasonable basis to consider reunification services."  Mother also attached a certificate of completion from her parenting class and sign-in sheets for her 12-step meetings between March 11 to May 14, 2020.

13

The court granted a hearing on Mother's section 388 petition, which was combined with the section 366.26 hearing on August 10, 2020.

Dr. Carolyn Crimmins, Mother's treating therapist, testified at the hearing as an expert in psychotherapy. She had been meeting with Mother twice a week since February 2020, dealing with issues related to trauma, parenting, and substance abuse. Many of Mother's trauma issues stemmed from childhood abuse and her own mother's lack of responsiveness, which led to depression and poor self-esteem. Dr. Crimmins had also worked with Mother on making her own parenting style more positive. Mother had shown a strong commitment to therapy and had made progress in the months they had worked together. She was "significantly more able to regulate her emotions" and "make good decisions and evaluate those decisions and to trust herself when making those decisions." Mother had also worked on recognizing stressors that led to substance abuse.

Dr. Crimmins testified that Mother's previous parenting style tended to be very reactive, but her parenting style had changed, and she had improved her ability to regulate her emotions, although she had not actually observed any of Mother's visits with the children. Dr. Crimmins believed Mother was now ready for unsupervised visits, based on the significant amount of progress she had made.

Edward Olvera, a licensed marriage and family counselor, testified as an expert in marriage and family counseling. Olvera had been meeting with Mother once a week since May 2020, for trauma-related therapy. He believed Mother was "in a recovery mode," based on her ability to stay in residential treatment, as well as her attitude and goals. He believed she had built enough protective capacity to manage her addiction. She was committed to staying out of a relationship involving domestic violence. Olvera also

14

believed Mother had sufficient protective capacity to enable her to keep A.E. safe from future sexual abuse, considering her sobriety and openness to dealing with the aftereffects of her own abuse. He had not yet worked with her on her own abuse related trauma, but believed she was a "prime candidate" for that type of work.

On cross-examination, Olvera acknowledged that Mother had never discussed with him the trauma her children had suffered, and he was unaware of what happened to the children and the form her failure to protect them had taken. Considering that Mother had only been in therapy with him for three months, Olvera acknowledged that she was in the very early stages of her trauma therapy. Regarding the course and length of that therapy, Olvera testified that he had recently worked with a patient whose trauma history was also severe, and they had worked together for a year and a half.

Mother testified that she had entered a substance abuse treatment program on March 9, 2020, and had transitioned a sober living environment a month before the current hearing. She had been sober since March 9, and had completed a domestic violence class while in her treatment program. Mother had visited with A.E. twice a week via phone calls since March 9; before that she had supervised visitation. During their calls, which were 10 to 15 minutes long, A.E. often asked Mother when she would be allowed to come home and said she missed her family. Mother believed that she and A.E. had a very good bond and that A.E. loves her very much.

The PGM testified that she was the care provider for A.E. and that she had known A.E. since she was born. The PGM, who supervised the visits between A.E. and Mother, testified that it was not true that A.E. regularly asked to return to Mother during visits. A.E. had asked Mother if she could return home at the very beginning of the case, in August 2019, when they

were having in-person, supervised visits. When visits changed from in-person to phone and Zoom in March 2020, due to the pandemic and Mother entering a treatment program, A.E. was confused about why she could not see Mother in person anymore. She then asked the PGM when she would be able to see her again. A.E. also said that she loved and missed Mother, but had not said she wanted to return to Mother since early in the dependency. On the last two phone calls with Mother, the PGM had noticed that A.E. would be excited about the prospect of the call, but when she got on the phone, she became much more reserved and the PGM had to prompt her to join the conversation. Mother also was proactive in asking A.E. questions.

The PGM testified that A.E. was "such a joy," and had made significant progress since she had been in the home of the paternal grandparents, who now viewed her as one of their own children. A.E. had become "just bright eyed and more confident." She loved learning, going to church, and the predictable routine of the paternal grandparents' family. A.E. was still participating in weekly therapy with a trauma specialist. She loved seeing C.M., and was very nurturing and protective of her. When A.E. first came to live with the PGM, she expressed worry about her sister's safety, but now she seemed at peace from seeing her sister safe. A.E. and C.M. visited together in person at least three times a month. The PGM also testified that she was the person A.E. turned to when she got hurt or something was wrong. The PGM believed she was in a parenting role with A.E., teaching and guiding her.

Following the arguments of counsel, the juvenile court ruled on the section 388 petition. The court first found that Mother had demonstrated "a remarkable change in circumstances" when she took it upon herself to enter a residential treatment program. The court then stated that because Mother

16

had been bypassed for reunification services, the burden was on her to establish by clear and convincing evidence that the requested change was in each child's best interest. The court found that C.M.'s bond with Mother was not nearly as strong as A.E.'s bond with Mother. C.M.'s bond was with her current caregivers.

The court then stated that A.E. was a much closer case because, although A.E. had previously had a relationship with paternal grandparents, Mother was her main caregiver for four years. For the previous year, however, A.E. had been in the paternal grandparents' care, and was thriving with them. While the court believed that Mother had a place as a parental figure in A.E.'s life, it concluded there was not clear and convincing evidence that it would be in A.E.'s best interest for Mother to be offered reunification services.

The court then made its section 366.26 rulings, finding that both children were generally and specifically adoptable, and that it would be in both children's best interests for parental rights to be terminated and a plan of adoption ordered. The court further found that the parental benefit exception to adoption did not apply as to Mother and A.E. Although they had a bond due to four shared years, in the final year with Mother, A.E. "was pushed into a parentified role where she was the protector of her tiny sibling. And that this was a complete and negative interaction in her relationship with both her mother and her stepfather." Once she began living with the paternal grandparents, A.E. became "able to actually adjust to her childhood and not her parenthood."

The court then ordered termination of Mother's parental rights, as well as the parental rights of Tyler and Albert. The court granted both sets of

17

caregivers de facto parent status and identified them as the prospective adoptive parents.

On September 9, 2020, Mother filed a notice of appeal from the orders terminating her parental rights and denying her section 388 petition, as to both children.

On October 9, 2020, Tyler filed a notice of appeal from the order terminating his parental rights, as to A.E.

## DISCUSSION

### I. *The Juvenile Court's Denial of Mother's Section 388 Petition as to A.E.*

Mother challenges the juvenile court's denial of her section 388 petition and refusal to order reunification services, as to A.E. only. She contends the court abused its discretion when it determined that ordering reunification services would not be in the best interest of A.E.

Although provision of reunification services is the norm in dependency proceedings (see § 361.5, subd. (a)), "[r]eunification services need not be provided to a parent or guardian . . . when the court finds, by clear and convincing evidence," any of a series of factual circumstances listed in section 361.5, subdivision (b). (§ 361.5, subd. (b).) In such a case, " 'the general rule favoring reunification is replaced by a legislative assumption that offering [reunification] services would be an unwise use of governmental resources' and the court may bypass services. [Citation.]" (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1193 (*L.S.*).) Reunification services in such circumstances may be provided to a parent described in most of the paragraphs of subdivision (b), including paragraphs (5) and (6), only if "the court finds, by clear and convincing evidence, that reunification is in the best

18

interest of the child" (§ 361.5, subd. (c)(2)), based on information it deems relevant, including factors set forth in subdivision (i) of section 361.5.[4]

Normally, at a hearing on a section 388 petition, the burden of proof is on the moving party to show by a preponderance of the evidence that there is new evidence or changed circumstances and that the proposed modification is in the best interests of the child. (See § 388, subd. (a)(1)); *L.S.*, *supra*,

---

[4] As a preliminary matter, as respondent points, although the juvenile court bypassed reunification services for Mother pursuant to section 361.5, subdivision (b)(5) and (b)(6), as to both children, the denial of reunification services as to A.E. should have been based solely on section 361.5, subdivision (b)(6), since paragraph (5) applies only in cases in which allegations in a petition were sustained under subdivision (e) of section 300. Here, only C.M.'s petition included allegations under section 300, subdivision (e). Thus, the court erred when it also ordered the bypass of reunification services as to A.E. under section 361.5, subdivision (b)(5).

For the first time in her reply brief, Mother acknowledges the court's error and argues: "To the extent that it was foreseeable that mother would subsequently seek reunification services, trial counsel was ineffective in failing to challenge the bypass pursuant to section 361.5, subdivision (b)(5), for A.E. or arguing at the section 388 hearing that the finding was made under the wrong standard." (Citing *Strickland v. Washington* (1984) 466 U.S. 668.) Mother's abbreviated and belated claim of ineffective assistance of counsel cannot succeed. First, the evidence supporting the court's decision to deny services to Mother under subdivision (b)(6) of section 361.5 is, as the Factual Background of this opinion reflects, overwhelming, and second, as we shall discuss, *post*, the court did not abuse its discretion when it determined, pursuant to section 388, that Mother had not satisfied her burden of demonstrating by clear and convincing evidence that delaying permanency for A.E. in order to provide Mother with reunification services was in A.E.'s best interest. Thus, the court's error in including subdivision (b)(5) as a second ground for denying reunification services could not have prejudiced Mother. (See *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1668 [parent in juvenile dependency proceeding claiming ineffective assistance of counsel "must demonstrate that it is 'reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error' "], quoting *People v. Watson* (1956) 46 Cal.2d 818, 836.)

230 Cal.App.4th at pp. 1193–1194.)  However, a different burden applies in a case such as this, where a party "petitions the court prior to an order terminating parental rights, to modify the order that reunification services were not needed pursuant to paragraphs  (4), (5), and (6) of subdivision (b) of Section 361.5 . . . , and the court orders a hearing . . . ."  (§ 388, subd. (a)(2).) In such a case, "the court shall modify the order that reunification services were not needed . . . only if the court finds by clear and convincing evidence that the proposed change is in the best interests of the child."  (*Ibid.*; see *L.S.*, at p. 1194; Cal. Rules of Court, rule 5.570(h)(1)(C) [parent who petitions court under section 388 for reunification services after prior denial under, inter alia, section 361.5, subdivision (b)(6), "must show by clear and convincing evidence that the proposed change is in the best interests of the child"].)[5]

In this case, three months after the court's order bypassing reunification services and after the court had set the matter for a section 366.26 hearing, Mother filed a section 388 petition, arguing that she had changed her circumstances and that ordering reunification services, a trial home visit, a return of A.E. and C.M. to her care with family maintenance services would be in the children's best interests.  When it ruled on the petition, the juvenile court first found that Mother's circumstances *had* changed, noting that she had taken it upon herself to enter a residential substance abuse treatment program.  The court then found, however, that although Mother was A.E.'s main caregiver for four years before A.E.'s removal, for the past year, A.E. had been in the care of her paternal grandparents, who had known her all her life, and A.E. was thriving with them.  Therefore, while the court believed that Mother had a place as a parental figure in A.E.'s life, it could not find by clear and convincing

---

[5] All further rule references are to the California Rules of Court.

evidence that it would be in A.E.'s best interest for Mother to be offered reunification services.

The decision whether to grant or deny a section 388 petition is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

Both parties frame their arguments regarding whether the court properly denied Mother's section 388 petition using the list of factors set forth in subdivision (i) of section 361.5,[6] which a court must consider at disposition when determining whether an initial grant of reunification services for a parent described in, inter alia, subdivision (b)(6) of that section are in the child's best interest. (See § 361.5, subd. (c)(2); see also *In re A.M.* (2013) 217 Cal.App.4th 1067, 1075 [fact that parent had sought reunification services by filing a section 388 petition for modification of court's prior order denying reunification services "did not excuse the [juvenile] court from following the requirements of section 361.5, subdivision (c)" in determining whether to grant the parent's section 388 petition]; but see *L.S.*, *supra*, 230 Cal.App.4th at p. 1195 [after reunification services have been denied and

---

[6] Section 361.5, subdivision (i) provides: "In determining whether reunification services will benefit the child pursuant to paragraph (6) or (7) of subdivision (b), the court shall consider any information it deems relevant, including the following factors: [¶] (1) The specific act or omission comprising the severe sexual abuse or the severe physical harm inflicted on the child or the child's sibling or half sibling. [¶] (2) The circumstances under which the abuse or harm was inflicted on the child or the child's sibling or half sibling. [¶] (3) The severity of the emotional trauma suffered by the child or the child's sibling or half sibling. [¶] (4) Any history of abuse of other children by the offending parent or guardian. [¶] (5) The likelihood that the child may be safely returned to the care of the offending parent or guardian within 12 months with no continuing supervision. [¶] (6) Whether or not the child desires to be reunified with the offending parent or guardian."

21

a parent subsequently files a section 388 petition requesting reunification services, section 361.5 is no longer relevant, and only section 388's requirements, including its burden of proof, are applicable].)[7]

Regardless of how the parties frame the best interests issue, the overarching question on appeal is whether the juvenile court abused its discretion when it found that Mother had not satisfied her burden of showing by clear and convincing evidence that it would be in A.E.'s best interest for Mother to be granted reunification services. (See § 388, subd. (a)(2); cf. § 361.5, subd. (c)(2).) We will therefore focus on that question, keeping in mind the late stage of the proceedings at which Mother filed her section 388 petition, as we address the parties' arguments, which are made with reference to the factors set forth in subdivision (i) of section 361.5. (See *In re G.B.* (2014) 227 Cal.App.4th 1147, 1163 ["Once reunification services are terminated (or, as in this case, never ordered in the first place), the focus of the proceedings changes from family reunification to the child's interest in permanence and stability"], citing, inter alia, *In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.)[8]

---

[7] At the time of the juvenile courts' section 388 determinations in *L.S.* and *A.M.*, a parent's burden for showing that reunification services would be in the child's best interest was still a preponderance of the evidence, unlike section 361.5, for which the burden of proof was already clear and convincing evidence. Following the 2012 amendment of section 388, that section also required the clear and convincing evidence burden of proof for parents requesting reunification services if the court had previously ordered the bypass of reunification services under subdivision (b)(4), (b)(5), or (b)(6) of section 361.5. (§ 388, subd. (a)(2); see Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1425 (2011-2012 Reg. Sess.), as amended, May 30, 2012.)

[8] The parties disagree about whether it is appropriate at this stage in A.E.'s dependency to also utilize the factors set forth in *In re Kimberly F.* (1997) 56 Cal.App.4th 519, for analyzing whether a change requested under section 388 is in the child's best interest. (Cf. *In re J.C.* (2014) 226

Mother first argues that a grant of reunification services would be in A.E.'s best interest because Mother had demonstrated that if the court ordered reunification services, it was likely that A.E. would be returned to her care within 12 months without the need for continued supervision. (Cf. § 361.5, subd. (i)(5).) In support of this claim, she cites the evidence from her therapist, Dr. Crimmins, who testified at the section 388 hearing that over the months she had worked with Mother on issues related to her own trauma, her parenting, and substance abuse, Mother had made significant progress in her ability to regulate her emotions, make good decisions, and recognize stressors that had led to substance abuse. Mother observes that Dr. Crimmins had originally believed that it would take at least "a couple of years" of therapy for Mother to be able to safely parent, but by the time Mother filed her section 388 petition, Dr. Crimmins had found she had made "greater than expected amount of progress during a relatively short period." Dr. Crimmins testified at the hearing that Mother's parenting style had changed, and she was now more able to regulate her emotions. Although she had never observed any of Mother's interactions with her children, she believed Mother was ready for unsupervised visitation. Notably, Dr. Crimmins did not offer an opinion about if and when Mother could safely *parent* A.E. without any supervision.

---

Cal.App.4th 503, 526 [declining to apply *Kimberly F.* factors "on the eve of the .26 hearing," where focus was on the child's need " 'for permanency and stability' "].) Even assuming these factors might be relevant, they are quite similar to the factors in subdivision (i) of section 361.5, which the parties already discuss in depth. (See *Kimberly F.*, at p. 532 [Summarizing factors as "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been"].)

Mother also cites the hearing testimony of Olvera, her trauma therapist, who believed that Mother was ready to deal with her own sexual trauma and had gained sufficient protective capacity to keep A.E. safe from future sexual abuse. Olvera acknowledged, however, that he had only been working with Mother for three months and that he had never discussed what had happened with her children or how she had failed to protect them. He also acknowledged that Mother was in the very early stages of her trauma therapy, and stated that he had worked with another patient with similarly severe trauma history for one and a half years. Mother asserts that Olvera further testified that Mother "could engage in trauma therapy while still being a responsible parent." This is not an accurate reading of the record, however. Olvera was describing a prior patient who was able to engage in trauma therapy while responsibly parenting her children; that parent had been "a responsible parent all along." This obviously was not true of Mother, and Olvera's testimony about his other patient is not pertinent to Mother's circumstances.

Mother next argues that a grant of reunification services would be in A.E.'s best interest considering the evidence of their strong bond and the fact that A.E. desired to return home to Mother. (Cf. § 361.5, subd. (i)(6).) The court found that Mother has "a place as a parental figure" in A.E.'s life, but considering all of the evidence, the court concluded this fact alone was insufficient to warrant a grant of reunification services. At the hearing on her section 388 petition, Mother had testified that A.E. often asked her during visits when she would be allowed to come home and said she missed her family. The PGM, who supervised all visits between Mother and A.E., testified, however, that A.E. had initially asked when she would be returning home. But, since very early in the dependency case, A.E. had not said she

24

wanted to return to Mother's home. Rather, she said that she wanted to have an in-person visit with her when the pandemic was over. The court plainly found the PGM's testimony more reliable than Mother's. (See *In re I.B.* (2020) 53 Cal.App.5th 133, 159 ["We are mindful of our limited standard of review and will not reweigh the credibility of witnesses"].)

The relevant evidence further showed that the paternal grandparents—with whom A.E. already had "a healthy attachment" and whose home had "been her safe haven" before she was placed with them—had now been in a parenting role with A.E. for the past year, and that A.E. was flourishing in the nurturing, stable environment of their home. (Cf. *Stephanie M.*, *supra*, 7 Cal.4th at p. 317 [" 'When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role [and] will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child' "].)

In short, the evidence in the record shows that Mother made admirable progress in a short period of time, but she is still early in the process of addressing her own trauma-related issues, her substance abuse, and her parenting issues. While the evidence shows that she and A.E. still have a loving bond, it also shows that A.E. is thriving in the loving, secure home of the paternal grandparents, who now fill the parental role for her. With them, A.E. is able to live without constant fear for herself and her younger sister.

Considering the evidence as a whole and the heightened burden of proof, we conclude the court did not abuse its discretion when it found that Mother had not satisfied her burden of showing by clear and convincing evidence that a grant of reunification services three months after she had been denied such services and on the cusp of the section 366.26 hearing

25

would be in A.E.'s best interest.  (See § 388, subd. (a)(2); see also *In re G.B.*, *supra*, 227 Cal.App.4th at p. 1163; *In re J.C.*, *supra*, 226 Cal.App.4th at p. 526.)

## II.  *ICWA*

Both Mother and Tyler contend the orders terminating parental rights must be conditionally reversed because the juvenile court failed to ensure compliance with ICWA as to Mother, Tyler, and Albert.  Respondent agrees that there should be "a limited remand for purposes of ICWA compliance."

### A.  *Trial Court Background*

In Indian Child Inquiry Attachments (ICWA-010(A)), attached to the initial petitions, the social worker stated that on August 1, 2019, Mother reported that she has no known Native American ancestry.  Then, in the September 10 jurisdiction/disposition report, the social worker stated that Mother reported that she had "Blackfeet/Cherokee" ancestry, but was not a member of a tribe.  Albert also reported having Native American history on his father's side, but was not aware of any tribal membership.  Albert provided contact information for his father so that more information could be gathered.

On September 25, 2019, the Department sent "Notice of Child Custody Proceeding for Indian Child" (ICWA-030; ICWA notices) for A.E. to the Bureau of Indian Affairs (BIA), Secretary of the Interior, Blackfeet Tribe of Montana, Eastern Band of Cherokee Indians, Cherokee Nation, and United Keetoowah Band of Cherokee.  Between October 2019 and January 2020, the Department received responses from the Eastern Band of Cherokee Indians; the Blackfeet Tribe; and the Cherokee Nation, each indicating that A.E. would not be considered an Indian child.

26

On September 25, 2019, the Department sent ICWA notices for C.M. to the BIA, Secretary of the Interior, and the same four tribes that were sent notice as to A.E. The Eastern Band of Cherokee and the Cherokee Nation responded that C.M. would not be considered an Indian child.

In the December 5, 2019 addendum report, the social worker reported that she had first met with Tyler on November 26, and he had stated that he had Native American ancestry, specifically the Comanche Tribe through his maternal grandfather, although Tyler had never been a member. The social worker noted that this information had already been collected from the PGM during the initial investigation.

In the June 4, 2020 section 366.26 report, the social worker stated that on October 7, 2019, notice was sent to the BIA and Secretary of the Interior as to A.E., based on Tyler's report of Comanche heritage. However, the record contains no copies of ICWA notices mailed on October 7, 2019.

In the June 4, 2020 section 366.26 reports as to both children, the Department requested a finding that ICWA did not apply.

In the August 10, 2020 findings and orders after the section 366.26 hearing, the juvenile court found that the court and the Department had properly inquired whether A.E. and C.M. were or might be Indian, had filed proper notice to all relevant tribes, and had filed all proofs of notice and responses from tribes. The court concluded that because no tribe had found the children eligible for membership, ICWA did not apply.

## B. *Legal Analysis*

"ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards that a state court, except in emergencies, must follow before removing an Indian child from his or her

27

family.  (25 U.S.C. § 1902[.])" (*In re Austin J.* (2020) 47 Cal.App.5th 870, 881–882; see 25 C.F.R. § 23.1 et seq.; Welf. & Inst. Code, § 224 et seq.)

Under recently amended section 224.2, which is part of the state statutory scheme implementing ICWA, the juvenile "court and child protective agencies remain under 'an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child.'  That duty to inquire begins with initial contact (§ 224.2, subd. (a)) and obligates the juvenile court and child protective agencies to ask all relevant involved individuals whether the child may be an Indian child.  (§ 224.2, subds. (a)-(c)[.])

"In addition to the court's and agency's responsibilities at the outset of the proceedings, section 224.2, subdivision (e) . . . impose[s] a duty of further inquiry regarding the possible Indian status of the child '[i]f the court, social worker, or probation officer has reason to believe that an Indian child is involved in a proceeding.'  That duty of further inquiry requires interviewing, 'as soon as practicable,' extended family members, contacting the BIA of Indian Affairs and '[c]ontacting the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility.'  (§ 224.2, subd. (e)(1)-(3).)  This informal contact with the tribe must include 'sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination.'  (§ 224.2, subd. (e)(3)[.])" (*In re T.G.* (2020) 58 Cal.App.5th 275, 290, fn. omitted; see also rule 5.481(a)(4) [mandating further inquiry if a social worker "knows or has reason to know or believe that an Indian child is or may be involved"].)

"On appeal, we review the juvenile court's ICWA findings for substantial evidence.  ([Citation]; see section 224.2, subd. (i)(2) [ICWA

28

findings 'subject to reversal based on sufficiency of the evidence'].) But where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied. [Citation.]" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1051, fn. omitted.)

In this case, Mother, Tyler, and the Department agree that the Department had reason to believe A.E. and C.M. are Indian children based on the three parents' statements to the social worker, but the record contains no indication that the parents were asked to complete the required Parental Notification of Indian Status forms (ICWA-020), and there are no completed ICWA-020 forms in the record. (See rule 5.481(a)(2)(c).) The parties also agree that the Department's reports fail to show that it made any further inquiry about the Indian ancestry of the parents' families, for whom the Department had contact information, once they received the initial information that A.E. and C.M. could be Indian children. (See § 242, subds. (b), (e); rule 5.481(a)(4).) Finally, it is undisputed that the ICWA notices sent to the BIA, the Department of the Interior, and tribes, based on Mother's report of Native American ancestry, did not include readily available information regarding both children's MGM, or A.E.'s PGM. (§§ 242.2, subd. (e)(2)(A); 224.3, subd. (a)(5)(C).) In addition, there is no evidence that ICWA notices were sent based on Tyler's and the PGM's statements regarding their Comanche ancestry. (See rule 5.482(a)(2)(C); §§ 224.2, subd. (e)(2)(B), (C); 224.3, subds. (a), (c).)

In light of this undisputed evidence of the Department's failure to make adequate inquiry and the juvenile court's failure to ensure that the Department had complied with ICWA, we shall conditionally reverse the orders terminating parental rights and remand the matter to the juvenile court for compliance with the requirements of ICWA. (See *In re D.S.*, *supra*,

29

46 Cal.App.5th at p. 1051; see also *In re T.G., supra*, 58 Cal.App.5th at p. 292.)

## DISPOSITION

The orders terminating Mother's, Tyler E.'s, and Albert M.'s parental rights are conditionally reversed. The matter is remanded to the juvenile court with directions to order the Department to comply with the inquiry and notice provisions of ICWA and related California law, as set forth in this opinion. If, after proper inquiry and notice, a tribe claims A.E. and/or C.M. is an Indian child, the juvenile court shall proceed in conformity of ICWA as to that child. If no tribe claims A.E. and/or C.M. as an Indian child, the order terminating parental rights shall be reinstated as to that child.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Miller, J.


*In re A.E.* (A160928)

31